# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>    v.<br><br>CARLOS GAYTAN,<br><br>  Defendant. | **Criminal No. 13-117 (CKK)**<br>**(Civil Action No. 14-052)** |

## MEMORANDUM OPINION
(September 25, 2014)

Presently before the Court is Defendant Carlos Gaytan's [23] Motion to Vacate Sentence pursuant to 28 U.S.C. § 2255. The Defendant, who is proceeding *pro se*, requests that the Court reconsider and reduce his sentence because the Court imposed a lesser sentence on his codefendant, Alicia Gaytan. Upon a searching review of the parties' submissions,[1] the relevant authorities, and the record as a whole, the Court finds that the Defendant is not entitled to the requested relief. Accordingly, the Court shall DENY the Defendant's Motion to Vacate Sentence.

## I. BACKGROUND

### A. Factual Background

Defendant pled guilty to one count of Conspiracy to Distribute and Possess With Intent to Distribute One Kilogram or More of Heroin and Five Hundred Grams or More of Cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1)(A)(i) & (b)(1)(B)(ii). The underlying facts in this case to which the Defendant agreed in a signed statement and during the plea colloquy under

---

[1] Def.'s Mot. to Vacate Sentence, ECF No. [23]; Govt.'s Opp'n, ECF No. [31]. The Defendant filed no reply.

oath are as follows: In April of 2012, Daniel Zintura-Flores [hereinafter "Zintura"] offered to give Defendant a large quantity of cocaine to sell. Gov't. Factual Proffer (Apr. 23, 2013) at 5, ECF No. [2]. Defendant approached Juan Gaytan [Defendant's brother] and Sergio Cuadros-Menchaca, both of whom were living in the same apartment as Defendant, and asked if they would be able to distribute a large quantity of cocaine. *Id.* Both men said they could, and encouraged Defendant to get cocaine from Zintura. *Id.* Zintura gave Defendant a kilogram of cocaine and indicated the price, which was either $32,000 or $33,000. *Id.* Defendant gave the kilo to his brother and Cuadros-Menchaca. *Id.* They "cut" or diluted the cocaine with a supplement they purchased at a GNC store. *Id.* They distributed all of the cocaine, and then gave Defendant the money to pay Zintura for the cocaine. *Id.* at 5-6. Zintura came to Defendant's apartment to collect the money. *Id.* at 6.

In May of 2012, Zintura and Maria Gaytan [Defendant's aunt] brought two kilograms of cocaine to Defendant in his apartment. *Id.* Zintura said he wanted Defendant to pay him back $32,000 for each of those kilos. *Id.* Juan Gaytan [Defendant's brother] and Cuadros-Menchaca were able to distribute the first kilogram. *Id.* However, when they opened the second kilogram, it appeared to them to be of poor quality. *Id.* As a result, they were not able to distribute that kilogram. *Id.* Defendant attempted to return the kilogram to Zintura, but was not immediately able to do so, and so that kilogram of poor quality cocaine was discovered and seized by the FBI during the search warrant executed at the apartment shared by Defendant, Juan Gaytan, and Cuadros-Menchaca on the day of his arrest. *Id.* In addition, the FBI recovered over $11,000 in cash and a device used to press cocaine into a kilogram form from that apartment. *Id.*

In May of 2012 at 5:05 p.m., Maria Gaytan, using Zintura's phone, asked Defendant if he had any customers for "the stronger type, the most expensive type?" *Id.* She stated that she

could not say the name but it starts with an "E," and that they are being offered some. *Id.* Defendant asked the price. *Id.* In this conversation Maria Gaytan inquired as to whether Defendant would be able to distribute heroin. *Id.* The call refers to heroin; the "H" in "heroin" is a silent H in Spanish and the word, phonetically, begins with an "E" sound, and heroin is much more expensive than cocaine. *Id.* At 5:45 p.m., Maria Gaytan asked Defendant if he "found that out for her." *Id.* Defendant needed to be reminded of what she was talking about. *Id.* Maria Gaytan sounded out "ERO" (as if to sound out the Spanish pronunciation of heroin). *Id.* She restated that it is double the price. *Id.* Maria Gaytan went on to tell Defendant that "it" would happen tomorrow for sure. *Id.* A tractor-trailer with Texas plates carrying a load of heroin arrived the next day and parked outside Defendant's stepmother's home. *Id.* at 6-7. In a later conversation at 6:41 p.m., Defendant told Maria Gaytan that he did not find anyone but Defendant was waiting for Juan to call him. *Id.* at 7. This conversation was in reference to Maria Gaytan's earlier inquiry regarding heroin. *Id.*

On May 21, 2012, at 7:34 p.m., Defendant spoke to Maria Gaytan, who indicated that they were working on the stuff she told him about. *Id.* She then said that their stuff would get here on Wednesday. *Id.* Zintura is heard in the background saying cars. *Id.* Maria Gaytan then revised her statement to say that the cars would arrive on Wednesday. *Id.* Maria Gaytan then stated that the stuff that had arrived was the other stuff she told him about, the other cars. *Id.* Defendant understood that Maria Gaytan meant the heroin they had spoken about had arrived. *Id.* Defendant was to understand that the referenced "stuff" that would arrive Wednesday would be cocaine which would be available to Defendant to sell. *Id.*

On May 22, 2012, codefendants Sunny Jo Schwinn and Andrew Slavinski drove the Dodge Durango loaded with the first group of nine or ten kilograms of heroin to New York City.

*Id.* Zintura, Maria Gaytan, and Alejandro Chapa followed some distance behind in another vehicle. Once in New York City, the heroin was transferred to others for redistribution. *Id.*

That day at 12:42 p.m., Defendant called Zintura's phone and spoke to Maria Gaytan, and asked if she had parking. *Id.* He informed Maria Gaytan that he had offered to pay $600, since there would be enough. *Id.* This was in reference to finding a safe place to park a vehicle; at that time Maria Gaytan and Zintura were engaged in the first of the two planned trips to New York City to distribute heroin sent by Guadalupe Galaviz. *Id.*

Upon returning from New York City, the group began making arrangements to make another trip the following day to transport the remaining kilograms of heroin to New York City. *Id.* at 8. On May 23, 2012, at approximately 9:45 a.m., agents on surveillance observed Zintura arrive at the Knights Inn in Laurel, Maryland, driving the white Durango. *Id.* Zintura knocked on the door of one of the hotel rooms. *Id.* Acting pursuant to previously issued arrest warrants, agents moved in, arresting Zintura, as well as Sunny Jo Schwinn and Andrew Slavinski, who were in the hotel room. *Id.* Acting pursuant to court-authorized search warrants, agents seized and searched the white Dodge Durango. *Id.* In a hidden compartment in the left rear wheel well of the vehicle, law enforcement discovered thirteen packages, each weighing approximately one kilogram and each separately wrapped, which contained a white substance consistent with cocaine. *Id.* Though each package field tested positive for cocaine, laboratory analysis proved 12 of the packages to be over 91% pure heroin, and one kilogram to be "compound 6," a heroin derivative and a schedule 1 controlled substance. *Id.*

A search of the bedroom shared by Zintura and Maria Gaytan revealed over $198,000 in cash. *Id.* at 9. In addition, law enforcement found a ledger recording amounts owed by and paid to Zintura by his cocaine customers. *Id.* The defendant's name appears in that ledger. *Id.*

4

The Government filed an Information on April 16, 2013, on the sole count of conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin and five hundred grams or more of cocaine hydrochloride in violation of 21 U.S.C. § 846 against Defendant. An arraignment and plea agreement hearing was held before the Court on April 23, 2013.

### B. *Written Plea Agreement*

The Defendant signed a written plea agreement on April 23, 2013. *See* Gov't. Plea Agreement (Apr. 23, 2013), ECF No. [3]. The agreement contained "Factual Stipulations" which included the Defendant's agreement that he "is accountable for at least 10 kilograms of heroin and 3 kilograms of cocaine powder, which quantity represents the total amount involved in [his] relevant criminal conduct and amounts reasonably foreseeable by him." Gov't. Plea Agreement (Apr. 23, 2013) at 2. The "Factual Stipulations" further included Defendant's agreement that "the attached 'Government Proffer of Facts' fairly and accurately describes [his] actions and involvement in the offenses to which [he] is pleading guilty." *Id.* The plea agreement also contained a signature page with a heading entitled "Defendant's Acceptance." The paragraphs under this heading read as follows:

> I have read this Plea Agreement and have discussed it with my attorney, Pleasant Brodnax, Esquire. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in this Agreement.
>
> I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this plea agreement. My attorney has reviewed with me the likely Sentencing Guidelines applicable under the terms of this plea as well as those which might apply after a trial in this case. I am satisfied with the legal

> services provided by my attorney in connection with this plea agreement and
> matters related to it.

*See* Gov't. Plea Agreement (Apr. 23, 2013) at 11.  The plea agreement also specifically advised

that "[y]our client understands that the sentence in this case will be determined by the Court,

pursuant to the factors set forth in 18 U.S.C., Section 3553(a)," "that the sentence to be imposed

is a matter solely within the discretion of the Court," and "that the Court is not obligated to

follow any recommendation of the Government at the time of sentencing . . . ."  *Id.* at 2, 4.

### C.    Sentencing

On August 1, 2013, this Court committed Defendant to the custody of the Bureau of

Prisons for a term of fifty-one months with credit for time served, followed by thirty-six months

of supervised release. Defendant was further ordered to pay a special assessment of $100.  On

August 12, 2013, the Court held a resentencing hearing to correct an offense level calculation in

the presentence report. Accordingly, the Court changed Defendant's sentence, committing him to

the custody of the Bureau of Prisons for a term of forty-six, rather than fifty-one, months.  This

sentence represented the lower end of the Advisory Sentencing Guideline range for an offense

level of 23 and a criminal history category of I, advising a period of incarceration from forty-six

months to fifty-seven months.

### D.    Plea and Sentencing of Alicia Gaytan

Alicia Gaytan, Defendant's stepmother, also pled guilty to a role in the conspiracy.

Gov't. Factual Proffer (Apr. 29, 2013) at 5, ECF No. [150].  Alicia Gaytan pled guilty to one

count of Conspiracy to Distribute and Possess With Intent to Distribute Five Hundred Grams or

More of Cocaine Hydrochloride in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(ii).  A

summary of the underlying facts in that case to which Alicia Gaytan agreed in a signed statement

and during the plea colloquy under oath are as follows: In or around April of 2012, Alicia Gaytan learned that Maria Gaytan [her sister-in-law] and Maria Gaytan's boyfriend, Daniel Zintura-Flores, were trafficking in multiple kilograms of cocaine. *Id.* In April of 2012, Maria Gaytan arranged for Alicia Gaytan to be given a kilogram of cocaine to sell with the promise that Alicia Gaytan would pay approximately $33,000 at a later date. *Id.* Alicia Gaytan received the cocaine in an apartment, from Maria Gaytan and Zintura. *Id.* Maria Gaytan showed Alicia Gaytan two other kilos that she had in the apartment, and showed Alicia Gaytan how to hide a kilo in her pants. *Id.*

After receiving the kilogram of cocaine, Alicia Gaytan added two ounces of inositol to dilute the cocaine in order to increase her profits. *Id.* Alicia Gaytan then sold portions of the kilogram of cocaine to two different buyers, one of whom she knew as "Pollo" but later learned was named "Anibal." *Id.* These sales involved different amounts of cocaine ranging from four ounces to 250 grams. *Id.* Alicia Gaytan eventually sold the entire kilogram and paid all or a portion of the money she owed for the cocaine to Maria Gaytan and Zintura. *Id.* at 5-6.

On May 15, 2012, Alicia Gaytan asked Maria Gaytan to meet her. Maria Gaytan told Alicia Gaytan that she if they could not get together today, then they would do so the following day. *Id.* at 9. Alicia Gaytan indicated that tomorrow was too far away and asked Maria Gaytan to separate her part – meaning set aside the cocaine so that it would be ready for Alicia Gaytan to pick up. *Id.* Alicia Gaytan spoke to Maria Gaytan again the following day about obtaining cocaine. *Id.* However, Maria Gaytan said she had to have all the money back in three days, and Alicia Gaytan could not distribute it that quickly. *Id.*

On May 21, 2012, Maria Gaytan asked Alicia Gaytan if anybody was at Alicia Gaytan's house. *Id.* Alicia Gaytan told Maria Gaytan that the door to her house could be opened

[unlocked] with a stiff card from the side, then push the door open. *Id.* Alicia Gaytan then told Maria Gaytan that she can use the room and do whatever Maria Gaytan wants. *Id.*

Later that day, a large shipment of drugs was transported to the Washington, D.C. area in a tractor-trailer. *Id.* The source of the shipment was Guadalupe Galaviz, and the shipment was being overseen by Alejandro Chapa, who worked for Galaviz. *Id.* When the trailer arrived, it was directed to park in front of Alicia Gaytan's home. *Id.* The trailer contained over twenty kilograms of heroin. *Id.* at 6-7. When Alicia Gaytan returned to her home that afternoon, she observed a tractor-trailer parked in front of her home, and a white truck in her driveway. *Id.* at 7. A man she did not know was standing in front of the house. *Id.* When Alicia Gaytan went into the house, she saw Zintura, Maria Gaytan, and a young man named Alex. *Id.* Alex and Zintura were wrapping a large amount of currency in plastic on a table. *Id.* While she did not personally see any drugs, Alicia Gaytan understood during these events that her home was being used for drug trafficking by, among others, Zintura and Maria Gaytan, from whom she had previously purchased narcotics. *Id.* Alicia Gaytan assumed the drugs to be cocaine and she did not attempt to stop the operation or to distance herself from the activities. *Id.*

That same day, Alicia Gaytan later went out of the house with Maria Gaytan and watched to ensure that no persons interfered with or observed work that Zintura and Alex were doing in the back of the trailer in order to access and remove the kilograms of heroin. *Id.* At some point Alicia Gaytan saw a mechanic arrive at her house. *Id.* The kilograms of heroin were brought inside Alicia Gaytan's home and handed over to the mechanic, who was then responsible for sealing the packages in a secret compartment in the Dodge Durango for further transport. *Id.* Alicia Gaytan was present during these events, was aware of their illegal nature, and allowed her home to be used to facilitate these activities. *Id.* Alicia Gaytan did not receive any money or

8

drugs for allowing Zintura and Maria Gaytan to use her home that day. *Id.*

As previously noted, on May 23, 2012, Zintura was arrested. *Id.* A search of the bedroom shared by Zintura and Maria Gaytan revealed over $198,000 in cash, which were proceeds from drug sales. *Id.* at 8. In addition, law enforcement found a ledger recording amounts owed by and paid to Zintura by his cocaine customers. *Id.* Alicia Gaytan's name appears in that ledger. *Id.* The ledger indicates that Alicia Gaytan received but did not pay for one kilogram of cocaine. *Id.*

The Government filed an Information on April 19, 2013, on the sole count of conspiracy to distribute and possess with intent to distribute five hundred grams or more of cocaine hydrochloride in violation of 21 U.S.C. § 846 against Alicia Gaytan. Alicia Gaytan signed a written plea agreement on April 29, 2013. *See* Gov't. Plea Agreement (Apr. 29, 2013), ECF No. [151]. The "relevant conduct" for Alicia Gaytan involved one kilogram of cocaine and for the purposes of calculating the Advisory Sentencing Guidelines, heroin between ten and 30 kilograms. On November 13, 2013, this Court committed Alicia Gaytan to the custody of the Bureau of Prisons for a term of thirty-eight months with credit for time served, followed by thirty-six months of supervised release. Alicia Gaytan was further ordered to pay a special assessment of $100. While the Advisory Sentencing Guidelines range, which, pursuant to the guidelines calculation, advised a period of incarceration from 46 months to 57 months, the Court granted Alicia Gaytan's motion for downward departure to which the government objected. The Court granted the downward departure and a variance because it found that Alicia Gaytan had a minimal role in this 20 codefendant conspiracy case, was a single parent to two minor children, demonstrated financial hardship, was a deportable alien, was sexually abused and neglected in childhood, and had severe medical problems. The Court specifically noted that one of the

reasons for sentencing of Alicia Gaytan outside the Guidelines was parity with the closest codefendant, namely Defendant, who also played a minimal role in the conspiracy.

### E. *Present Motion to Vacate Sentence pursuant to 28 U.S.C. § 2255*

On December 11, 2013, a letter was sent by Defendant to the Court requesting that his sentence be reconsidered. Def.'s Mot., ECF No. [25]. The letter states: "If there is a requirement for you to be presented with a formal motion before you can act I would request, if need [sic], you treat this as a 2255 petition for a reduction of sentence." Def.'s Mot. The Court let this motion be filed on January 13, 2014. *Id.* Defendant indicates that his stepmother, Alicia Gaytan, who also pled guilty on related charges was sentenced to 36 months incarceration. *Id.* The Court notes that while Defendant's Motion indicates Alicia Gaytan was sentenced to 36 months incarceration, in fact she was sentenced to 38 months incarceration. Defendant states: "Because of the sentence[] you imposed for her I am requesting you reconsider the sentence you imposed for me. I am requesting you reconsider my sentence[] because the evidence clearly showed her role in the conspiracy, and her culpability, was clearly more involved than mine." *Id.*

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner in custody under sentence of a federal court may move the sentencing court to vacate, set aside, or correct its sentence if the prisoner believes that the sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

The circumstances under which such a motion will be granted, however, are limited in

light of the premium placed on the finality of judgments and the opportunities prisoners have to raise most of their objections during trial or on direct appeal. "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady,* 456 U.S. 152, 166 (1982). Nonetheless, "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues, and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). However, the decision whether to hold a hearing is entrusted to the district court's discretion, particularly where, as here, the reviewing judge presided over the proceeding in which the petitioner claims to have been prejudiced. *United States v. Morrison,* 98 F.3d 619, 625 (D.C. Cir. 1996), *cert. denied,* 520 U.S. 1131 (1997). "If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition . . . ." Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 4.

### III.    DISCUSSION

Defendant requests that the Court reconsider his sentence of 46 months incarceration in light of the fact that the Court sentenced Alicia Gaytan to 38 months of incarceration for related charges. The Court finds that Defendant's request shall be denied for the reasons described herein.

Courts have consistently held that the mere fact that a codefendant receives a lesser sentence than defendant is not a basis for granting relief pursuant to 28 U.S.C. § 2255. *See generally, e.g., Hilbrich v. United States*, 371 F.2d 826 (7th Cir. 1967) (holding that a defendant was not entitled to a relief under section 2255 when he asserted that the sentencing judge, who was not the trial judge, was influenced by the sentence imposed by the trial judge on a

codefendant); *Montalvo v. United States*, 174 F. Supp. 2d 10, 12 (S.D.N.Y. 2001) (rejecting defendant's argument that his sentence should be realigned with that of another defendant in a related case who was sentenced by a different judge); *Lewis v. United States*, 369 F. Supp. 659 (E.D. Mo. 1973) (rejecting defendant's claim that he was denied Equal Protection because he received a longer sentence than his codefendant).

The Court shall nevertheless address the issues that warranted differing sentences for Defendant and Alicia Gaytan. Indeed, on appeal, the D.C. Circuit "review[s] [a sentence imposed by the district court] for both procedural soundness – including whether the district court considered the necessary factors and adequately explained a deviation from the Guidelines – and the substantive reasonableness of sentences is for abuse of discretion." *United States v. Wilson*, 605 F.3d 985, 1033-1034 (D.C. Cir. 2010) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). Pursuant to 18 U.S.C. § 3553(a), the Court must consider several factors in determining an appropriate sentences. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Defendant's claim for relief invokes one of the relevant factors, codified in section 3553(a)(6), which provides that the Court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Here, several differences warranted the eight-month disparity in sentences between codefendants Carlos Gaytan and Alicia Gaytan. Both codefendants had a total offense level of 23 with a criminal history category of I. This offense level for Defendant included a four-point reduction from the otherwise applicable Sentencing Guideline that the Court granted to Defendant during his first sentencing hearing, after finding that Defendant was a minimal participant in the conspiracy; a finding made for Alicia Gaytan as well. For both Defendant and Alicia Gaytan, the Court included a *Smith* departure as they both were subject to possible

12

deportation. Accordingly, the Guidelines recommendation was 46 to 57 months imprisonment for both codefendants. For Defendant, at re-sentencing, the government requested that Defendant be sentenced to 54 months in prison and the defense requested that Defendant be sentenced to 46 months. The Court sentenced Defendant to the lowest term of imprisonment within the Guideline range, namely 46 months. For Alicia Gaytan, the government requested that she be sentenced to 54 months in prison and the defense requested a term of 24 months. The Court granted Alicia Gaytan's motion for sentencing as a departure and as a variance outside the Guidelines to which the government objected, and sentenced Alicia Gaytan to 38 months incarceration.

The Court now turns to its reasons for imposing a lesser sentence on Alicia Gaytan than on Defendant. While both Defendants distributed cocaine, Defendants were held accountable for different quantities and types of drugs as "relevant conduct." Notably, the Court found that Defendant knew not just about the cocaine, but also the heroin. Indeed, he agreed to find buyers for the heroin, although he ultimately was unsuccessful in locating buyers. Alicia Gaytan did not plead guilty to the heroin conspiracy and denied having any direct knowledge of the heroin. Defendant ultimately was held accountable for three kilograms of cocaine that he sold or attempted to sell and Alicia Gaytan was held accountable for one kilogram of cocaine that she sold. Moreover, both codefendants attempted to facilitate the parking of the tractor-trailer hauling heroin. Although Alicia Gaytan allowed the vehicles to park at her home and served as the look-out for the transfer of the drugs from the tractor-trailer into her home and then into the Dodge Durango, Defendant also attempted to find parking for the cars involved in the heroin transaction, but ultimately was unsuccessful. The Court concludes that Defendant's knowledge of the heroin and his agreement to find buyers for the heroin, as well as being accountable for

three kilograms of cocaine as opposed to one kilogram of cocaine, warrants the sentencing difference between him and Alicia Gaytan. Further, the Court made specific findings at Alicia Gaytan's sentencing hearing as to its reasons for imposing a sentence outside the Guideline recommendation such as being a single parent and sole support of two minor children and having a serious medical condition, and specifically referenced the sentence imposed on Defendant when considering section 3553(a)(6) as required. Accordingly, the Court shall deny Defendant's request that the Court vacate his sentence.

## IV. CONCLUSION

For all of the foregoing reasons, the Court shall DENY Defendant's [23] Motion to Vacate Sentence pursuant to 28 U.S.C. § 2255. Furthermore, no Certificate of Appealability shall issue from this Court. To the extent the Defendant intends to file an appeal, he must seek a Certificate of Appealability from the United States Court of Appeals for the District of Columbia Circuit in accordance with Federal Rule of Appellate Procedure 22.

An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

*This is a final appealable order.*

_____
/s/
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE